**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CLAUDIO HERNANDEZ,** | : | |
| **Plaintiff** | : | |
| | : | **CIVIL NO. 1:05-cv-01655** |
| | : | |
| **v.** | : | **(Judge Kane)** |
| | : | |
| **JOHN A. PALAKOVICH, et al.,** | : | |
| **Defendants** | : | |

**MEMORANDUM**

This matter is before the Court on a renewed motion for summary judgment filed on March 11, 2014 by remaining Defendant Dr. Ronald Long, M.D.  (Doc. No. 204.)  Upon consideration of the arguments raised by the parties in their briefs, for the reasons provided herein, the Court will grant the motion for summary judgment and close the above-captioned case.

## I.  BACKGROUND

### A.  PROCEDURAL BACKGROUND

This 42 U.S.C. § 1983 civil rights and medical negligence action was initiated on August 15, 2005 upon the filing of a complaint by Plaintiff Claudio Hernandez, a former inmate incarcerated at the State Correctional Institution at Smithfield in Huntingdon, Pennsylvania ("SCI-Smithfield").  (Doc. No. 1.)  In his complaint, Plaintiff asserted violations of the Eighth Amendment to the United States Constitution and pendent state law claims of medical malpractice and intentional infliction of emotional distress against numerous SCI-Smithfield administrators and health care providers.  (Id.)  Shortly after commencing this action, Defendants moved to dismiss Plaintiff's complaint through the filing of separate motions to dismiss (Doc.

Nos. 19, 21, 22), which were eventually granted by this Court on November 10, 2010.  (Doc. No.

99.)  Concurrent with granting Defendants' motions to dismiss, the Court permitted Plaintiff

leave to file an amended complaint.  (Id.)

        Plaintiff filed a counseled three-count amended complaint setting forth a claim of

deliberate indifference in violation of the Eighth Amendment and related claims under

Pennsylvania law against the following Defendants: Superintendent John A. Palackovich,

Deputy Superintendent Kormanic, Health Care Administrator George Weaver, and treating

physician Dr. Ronald Long, M.D.  (Doc. No. 105.)  The factual allegations forming the basis of

this operative pleading concern the medical treatment Plaintiff received while incarcerated at

SCI-Smithfield.  (Id.)  Plaintiff asserts that Defendants exhibited deliberate indifference to his

serious medical needs in violation of the Eighth Amendment by delaying necessary surgical

intervention for an infection he developed following cataract surgery on his left eye at Holy

Spirit Hospital.  (Id.)

        On January 28, 2011, Defendant Long filed an answer to the amended complaint with

affirmative defenses, which he subsequently amended to include failure to exhaust administrative

remedies as an additional affirmative defense.  (Doc. Nos.  106, 117.)  On February 7, 2011,

Defendants Palackovich, Kormanic, and Weaver collectively moved for dismissal of the

amended complaint.  (Doc. No. 108.)  In a Memorandum and Order dated September 12, 2011,

the Court granted in part and denied in part the February 7, 2011 motion to dismiss.  (Doc. No.

119.)  Specifically, the Court granted the motion to dismiss with respect to all claims against

Defendants Palackovich and Kormanic, and denied the motion to dismiss with respect to the

claims against Defendant Weaver.  (Id.)  On September 21, 2011, Defendant Weaver answered

the amended complaint.  (Doc. No. 120.)

At the conclusion of the discovery period, remaining Defendants Long and Weaver

individually filed motions for summary judgment.  (Doc. Nos. 142, 146.)  In response to these

motions, Plaintiff moved to strike the declarations of two witnesses as well as other various

exhibits offered in support of Defendants' summary judgment motions.  (Doc. Nos. 182, 188.)

Based on the arguments raised by Plaintiff in his motions to strike, the Court reopened the

discovery period for forty-five (45) days for the purpose of deposing the two witnesses and

denied the pending motions for summary judgment without prejudice to Defendants renewing

and/or supplementing their motions following the expiration of the limited discovery period.

(Doc. No. 201.)

Defendants Long and Weaver filed renewed motions for summary judgment on March

11 and 13, 2014, respectively.  (Doc. Nos.  207, 208.)  On May 14, 2015, the Court denied

summary judgment only as it related to two limited bases for dismissal proffered by Defendants:

namely, Plaintiff's failure to exhaust administrative remedies and failure to submit expert

witness testimony as to his actual injuries.  (Doc. No. 224.)  In conjunction with its denial of

summary judgment on those narrow grounds, the Court deferred its adjudication of Defendants'

remaining arguments in their respective summary judgment motions pending settlement

discussions before Magistrate Judge Carlson.  (Id.)  Settlement was achieved as to Defendant

Weaver.  (Doc. No. 229.)  However, settlement was not reached with Defendant Long.

Accordingly, in light of the procedural posture of this case, the Court is now tasked with

addressing the remaining grounds of dismissal raised by Defendant Long in his pending renewed

motion for summary judgment.[1]  Specifically, remaining in this action are Plaintiff's Eighth

Amendment deliberate indifference, medical malpractice, and negligent infliction of emotional

distress claims against Defendant Long.

    In the renewed motion for summary judgment, Defendant Long invites the Court to grant

summary adjudication in his favor as a matter of law on the basis that the evidentiary material

appended to his dispositive motion establishes that Plaintiff received continued access to medical

care.  Plaintiff, in opposition to Defendant's motion for summary judgment, argues that a

genuine issue of material fact exists as to whether Defendant Long, in his capacity as both

Plaintiff's treating physician and site medical director, acted with deliberate indifference in

cancelling a surgical procedure scheduled for January 7, 2005 as a result of Plaintiff's refusal to

give informed consent.  This motion is fully briefed and is now ripe for adjudication on the

merits.

    B.    EVIDENTIARY RECORD

    This civil rights and medical negligence action is grounded on allegations that Defendant

Long, Plaintiff's treating physician and the site medical director for SCI-Smithfield,[2] deliberately

obstructed Plaintiff from receiving necessary surgical intervention for a non-medical reason.

---

[1] Notably, upon receiving notification that settlement was not reached with respect to Defendant Long, the Court directed Defendant Long to brief any outstanding summary judgment issues requiring disposition.  (Doc. Nos. 231-33.)  The Court has considered these briefs in addition to the fully briefed motion for summary judgment.

[2]  Defendant Long testified at his deposition that he is a board certified family practitioner employed by a medical services contractor for the Pennsylvania Department of Corrections as site director.  (Doc. 207-26 at 11:21.)  His responsibilities as site director include "oversee[ing] the entire health program for the site," and supervising "midlevels," i.e., physicians, nurse practitioners and physician assistants.  (Id. at 16:19-21, 17:12.)  In his capacity as a supervisor, Plaintiff is required to co-sign all physician assistant orders and notes within a 24-hour period.

Plaintiff's medical and optometric history germane to the instant motion for summary judgment is as follows.  At all relevant times to this action, Plaintiff, a native of Puerto Rico, was committed to the custody of the Pennsylvania Department of Corrections.  (Doc. No. 207-2 at 1.) Plaintiff arrived at SCI-Smithfield with a number of chronic conditions and specifically needed a follow-up ophthalmology appointment scheduled to address complaints of pain, blurriness, and loss of vision in his left eye.  On January 8, 2004, Plaintiff was evaluated by Christopher Patitsas, M.D., an ophthalmologist at an offsite medical facility.  (Id. at 3.)  Following this initial consultation, Dr. Patitsas recommended, on an urgent basis, that Plaintiff undergo a B-scan ultrasonography of the left eye to rule out a detached retina or tumor.  (Doc. No. 169-1 at 20.) On January 9, 2004, Defendant Long approved the recommendation and arranged for immediate diagnostic testing of Plaintiff to include a B-scan ultrasound at J.C. Blair Memorial Hospital the same day.  (Doc. No. 150-1 at 3.)  The results of that diagnostic testing revealed "[f]indings consistent with cataract.  However, there is also multi-loculated cystic abnormality around the lens and diffusely echogenic abnormality of the vitreous.  This is concerning for a tumor.  A

---

(Id. at 35:11-16.)  Defendant Long is involved with coordinating specialty referrals for inmates with qualifying conditions.  That process is described by Defendant Long as follows:

> Let's just say I see a patient.  I refer him to the specialist; it goes to the clinical coordinator, who then sends it off to our corporate office for the utilization review.  Once they approve that consult, if they feel it's needed, the clinical coordinator will then schedule that appointment. If it's an onsite appointment, you're allowed 30 days to get those appointments in.  If it's an outside appointment outside the walls, then you're allowed 60 days to get that appointment in.

(Id. at 37:11-21.)  The record supports that Defendant Long's role as Plaintiff's medical provider with respect to the treatment of Plaintiff's left eye was limited to "[s]etting up his treatment and care."  (Id. at 55:23.)

retinal detachment is unlikely." (Doc. No. 169-1 at 22.)  Defendant Long reviewed the findings

with Plaintiff on January 12, 2004 and shortly thereafter, referred Plaintiff to Dr. Thomas R.

Pheasant, M.D., an ophthalmologist with Retina Consultants, for a consultation.  (Id. at 23.)

Plaintiff was evaluated by Dr. Pheasant on February 5, 2004.  (Id. at 26.)  Dr. Pheasant reported

that Plaintiff's left eye "shows angle closure from 11:30-5:00, with a mature cataract.  An

ultrasound examination of the left eye was done, and it shows diffuse vitreous

hemorrhage/vitreous debris.  It is difficult to be certain whether a retinal detachment is present or

not." (Doc. No. 170-1 at 1.)  On the basis of that diagnosis, Dr. Pheasant requested authorization

in a letter to Defendant Long for Plaintiff "to have a pars plans lesectomy, a vitrectomy and a

possible scleral buckle, with a fluid-gas exchange and endolaser photocoagulation if the posterior

segment appears to be salvageable."  (Id.)  Dr. Pheasant remarked in his report that "[t]here is a

good chance that this eye has sustained trauma in the past and we are looking at the effects of the

old trauma.  This may therefore not be a repairable situation. . . . It would appear that this eye

will never have useful vision and the eye may, in fact, go phthisical (a small, blind, shrunken

eyeball) whether intervention is undertaken or not."  (Id.)  He suggested that if Plaintiff decided

to forego surgical intervention, he could be followed by Dr. Patitsas.  (Id.)

Following this consult, Defendant Long arranged for Plaintiff to meet with an attending

physician at SCI-Smithfield on February 23, 2004 to discuss Dr. Pheasant's recommendations.

On Plaintiff's request, the surgical procedure was approved and scheduled for March 22, 2004 at

Holy Spirit Hospital.  (Doc. No. 207-2 at 6.)  Ocular surgery was performed without incident.

(Doc. No. 150-1 at 7.)  On March 29, 2004, Plaintiff was medically cleared to return to SCI-

Smithfield.  (Doc. No. 150-1 at 9-10.)  Upon returning to SCI-Smithfield, Plaintiff was

scheduled for and attended routine follow-up appointments with an offsite ophthalmologist on March 31, 2004, and with Dr. Pheasant on April 7, 2004, on approval from Defendant Long. (Doc. Nos. 170-3 at 1, 152-1 at 10.)  On July 7, 2004, Defendant Long authorized a routine follow-up appointment with Dr. Pheasant for September 1, 2004.  (Doc. No. 170-5 at 1.)  Upon examining Plaintiff at that appointment, Dr. Pheasant recommended continuing the Pred Forte eye drops previously prescribed to him and referred Plaintiff to Dr. Patitsas for an eye examination and for the fitting of polycarbonate safety glasses.  (Id.)  Defendant Long promptly approved the recommendation of Dr. Pheasant and arranged for Plaintiff to be seen by Dr. Patitsas on October 29, 2004.

On September 30, 2004, prior to Plaintiff's October 29, 2004 offsite eye examination with Dr. Patitsas, Plaintiff presented at the clinic with complaints of "tearing, burning and cloudy vision" in his left eye.  (Doc. No. 150-1 at 14.)  A physician assistant, observing a severe infection upon examination, arranged for Plaintiff to be evaluated by Dr. Patitsas that afternoon. (Doc. No. 170-7 at 1-2.)  Based on his examination of Plaintiff, Dr. Patitsas prescribed sulfacetamide eye drops and recommended a follow-up appointment.  (Id.)  On October 1, 2004, at Defendant Long's direction, the recommended medications were ordered for Plaintiff.

The October 29, 2004 follow-up consultation with Dr. Patitsas, previously approved by Defendant Long, occurred as originally scheduled.  During that scheduled appointment, Dr. Patitsas made additional modifications to Plaintiff's prescriptions and raised with Plaintiff the possibility of enucleation (removal of the eye) as a treatment option.  (Doc. No. 170-6 at 1.) It is undisputed that Dr. Patitsas informed Plaintiff at that time as to what the surgical procedure would entail.  Indeed, Plaintiff's testified at his deposition that the surgeon "explained to [him]

that since the eye didn't work any[more], that he had to take the eye out.  And he was going to give [him] a plastic one with the computer. With the computer, he was going to make it look like the other eye."[3]  (Doc. No. 207-25 at 39.)  That same day, Defendant Long approved Dr. Patitsas' recommended treatment plan.  (Doc. No. 152-1 at 15.)  On November 10, 2004, Defendant Long met with Plaintiff to discuss the recent consult with Dr. Patitsas, specifically enucleation of Plaintiff's left eye.  (Doc. No. 207-2 at 15.)

On November 16, 2004, Defendant Long referred Plaintiff for a surgical consult with Dr. John J. Schietroma, M.D., of Oculoplastic Consultants of Central PA, P.C., which was scheduled for December 16, 2004.  (Doc. No. 170-8 at 1.)  During the surgical consult, Dr. Schietroma discussed the evisceration procedure with Plaintiff and obtained Plaintiff's written consent for the release of his medical records.  (Id.; Doc. No. 207 at 4.)  At the conclusion of the appointment, Dr. Schietroma forwarded a referral letter to Defendant Long apprising him of the following:

> As you know, this 58-year-old has a blind phthisical left eye, with some degree of discomfort.  He has seen Dr. [Patitsas], and a possibility of enucleation has been discussed. On examination, the eye is phthisical and cornea is opaque. He is currently using Atropine 1 drop to the left eye [twice a day], and Tobradex 1 drop to the left eye [4 times per day].
>
> I believe that the appropriate procedure for Mr. Hernandez would be an evisceration of the left eye.  This would involve removing the contents of the eye, but leaving the scleral shell in place.  And ocular implant would be placed within the scleral shell.

---

[3] Defendant Long testified that no one at SCI-Smithfield is charged with ensuring that the inmate understands the need for surgery. Rather, the offsite surgeon typically informs the inmate of the medical need for that surgery and "make[s] sure their patient understands what's going to happen with the surgery they are going to complete."  (Doc. No. 207-26 at 42:5-18.)

> This procedure can be performed as an outpatient at the Mount Nittany Surgery Center.  I can perform this procedure on January 7, 200[5].  If this date is okay with you we will try to make arrangements and send the necessary paperwork.

(Doc. No. 170-9 at 1.)  That same day, Defendant Long approved the procedure and coordinated the scheduling of surgery with Dr. Schietroma for January 7, 2005.  (Doc. 170-10 at 1.)

On December 22, 2004, in anticipation of surgery, Dr. Schietroma's office sent a surgery packet to SCI-Smithfield, which contained a surgical consent form requiring Plaintiff's signature.  (Doc. No. 177-1 at 1.)  On December 24, 2004, Nancy Merlini, a registered nurse at SCI-Smithfield, presented the consent form issued by Dr. Schietroma's office to Plaintiff for his signature.  (Doc. No. 150-1 at 16.)  However, Plaintiff refused to give his written consent. Consequently, based on Plaintiff's response, Ms. Merlini provided Plaintiff with a DC-462 refusal form to sign, which is furnished to inmates "when they are refusing recommended treatment."[4]  (Doc. No. 175-1 at 98:19.)  However, the progress notes state that Plaintiff refused to sign "anything till he speaks [to] his lawyer."  (Doc. No. 150-1 at 16.)[5]  Ms. Merlini's progress

---

[4] The DC-462 form is entitled "Release From Responsibility for Medical Treatment."  (Doc. 171-1 at 1.)  Ms. Merlini completed the blank sections of that form by hand, specifying that Plaintiff had refused surgical intervention to "eviscerate left eye and place implant" and had been advised that "without it, pain will continue."  (Id.)  Ms. Merlini wrote "refused to sign" on the "inmate signature" line of the form, and provided her own signature on the "attending health care provider signature" line.  (Id.)  The DC-462 form also contains Defendant Long's signature. (Id.)

[5] In addition to the progress notes, Plaintiff testified at his deposition to the following:

| | |
|---|---|
| Q. | For the January 2005 surgery, the one time that you said someone asked you to sign something, did you refuse to sign because you wanted to talk to a lawyer? |
| A. | Yes. |
| Q. | Why did you want to talk to a lawyer? |
| A. | Because I didn't know what I was about to sign. |

9

notes additionally provide, in shorthand form notation, her assessment of "Knowledge Deficit," and her plan to "notify MD." (Doc. No. 150-1 at 16.)

Defendant Long was not privy to Ms. Merlini's December 22, 2004 conversation with Plaintiff regarding the consent for surgery form, nor did he independently endeavor to obtain Plaintiff's written consent for surgery, as it was his understanding that if an outpatient surgical procedure was scheduled offsite, the offsite medical provider would obtain consent for that procedure "when they go over the risks and benefits of the surgery." (Doc. No. 207-26 at 44:20-22.) Indeed, Defendant Long testified that he never saw the consent for surgery form that was provided to Plaintiff, and is unaware of whether Ms. Merlini read the form aloud to Plaintiff. (Id. at 97:20-25; 98:1.) The record is also devoid of evidence supporting that Defendant Long was made aware of Ms. Merlini's progress note entry at that time.[6] While the record evidence does not support that Defendant Long reviewed Ms. Merlini's progress note, however, Defendant Long concedes that he did receive notification of Plaintiff's refusal to consent to surgery by way of the DC-462 form prepared by Ms. Merlini that he co-signed in his capacity as site medical director on December 22, 2004. (Id. at 96:16-21.)

---

[6] Specifically, Defendant Long testified in response to the question of whether he was notified of Ms. Merlini's progress note, "[a]t that point in time, I don't know. I don't know if at that point [ ] I would have been notified or not . . . I'm assuming I would have made a note if I had." (Doc. No. 207-26 at 96:10-15.) While Defendant Long cannot recall whether he read the progress note, he concedes that it would have been customary for him to review progress notes on a weekly basis, so it is likely that he would have read the progress notes sometime between December 24, 2004 and January 7, 2005, the scheduled date for Plaintiff's surgery. (Id. at 104:9-19.) Even so, Defendant Long acknowledges that the notation "Knowledge Deficit," has no professional medical connotations of which he is aware and that he would not have acted on Plaintiff's demand for a lawyer but rather, would wait for Plaintiff to speak with his lawyer before proceeding any further. (Id. at 97:8-14, 105:11-16.)

Plaintiff's medical chart reveals that on January 3, 2005, Donna Beeler, a registered nurse with SCI-Smithfield approached Plaintiff again with the consent form and DC-462 form.  She logged the following progress note detailing her communications with Plaintiff on this occasion:

> Refuses to sign consent – Refuses to sign refusal.- Repeatedly says "My lawyer told me not to sign anything" – then states "If I sign anything it might hurt my law suit." – States he doesn't want to talk with anyone else- Cannot reason [with] him re: need for surgery.  [Assessment:] none [Plan:] CR[.][7]

(Doc. No. 150-1 at 16.)  Similar to Ms. Merlini, Ms. Beeler documented Plaintiff's refusal to release the institution from liability on the DC-462 form itself.  Specifically, she described the nature of the treatment and the consequences of refusing the treatment as "Removal of the left eye to prevent spread of vision loss to right eye.  By refusing this surgery I am at risk of becoming totally blind." (Doc. No. 171-2 at 1.)  On the signature line of the DC-462 form where Plaintiff was to sign, Ms. Beeler wrote "Refused to sign 1-3-05" and provided her signature on the "Attending Health Care Provider" signature line.  (Id.)  The record reflects that this form was signed by Dr. Joseph Romeo, M.D., an attending physician at SCI-Smithfield.

According to Plaintiff, he was confronted by a nurse on only one occasion regarding the consent for surgery form and the nurse refused to explain what the consent form said.  (Doc. 207-25 at 29.)  He submits that he refused to sign the form because he wanted to speak with his lawyer, as he "didn't know what [he] was about to sign."[8]  (Id. at 31.)  Notably, Plaintiff submits that he did not ask to speak with a doctor and did not request that a Spanish-speaking interpreter

---

[7] Defendant Long testified at his deposition that "CR" signifies "Chart review," meaning "it would come to [him] in a chart review."  (Doc. No. 175-1 at 27, 98:19.)  However, as Defendant Long admits, the progress notes are devoid of any notation indicating that he reviewed the chart on that occasion.  (Id.)

[8] In addition, representations have been made by Plaintiff throughout this litigation that he did not sign the consent form because of his inability to understand the English language.

11

be made available to him for purposes of translating the contents of the form because he was

"quickly sent . . . back to [his] block."  (Id.)

On January 5, 2005, Defendant Long noted in Plaintiff's medical chart that Plaintiff had

refused enucleation of his left eye.  (Doc. No. 170-10 at 1.)  Consequently, Plaintiff's surgery

was cancelled.  Thereafter, Plaintiff continued to be followed by medical personnel for various

chronic conditions in conjunction with his scheduled ophthalmologist appointments and

benefited from medication management, which included the regular reordering of Tobradex eye

drops.  (See Doc. No. 150-1 at 17-40.)  While Plaintiff's medical chart is devoid of any

discernable reference to complaints from Plaintiff of pain in his left eye after his surgery was

cancelled, Plaintiff testified in his deposition that he did complain about his left eye in 2005

more than once to an unidentified physician.[9]  Notwithstanding this arguably disputed fact,

---

[9] On further review of the deposition testimony, it appears that Plaintiff testified to having complained about his left eye in the time period following his first surgery in March of 2004, not after the cancellation of his second surgery on January 7, 2005.  That line of questioning provides, in relevant part:

Q.    How many times do you recall complaining or making a complaint about  your left or right eye in 2005?

A.    I think more than once. . . . Let's say about three visits. Three visits after the surgery.  Because the first drops that they gave me, they weren't working.  So I had to put a complaint that the drops were not working, and they had to bring me back here and they gave me different drops.

Q.    Mr. Hernandez, I'm truly not trying to be difficult, and you can say I don't  remember. I'd rather you say that than guess about the times you  would have made complaints.  Your surgery was in March 2004.  I'm trying to understand whether the three complaints you're talking about you made in 2005.

A.    But you are confusing me.  Because you are talking to me about 2004, and then you are jumping to 2005.  I don't have memory for that.

Plaintiff discloses, and the record corroborates, that he neither questioned the cancellation nor requested the rescheduling of the surgery on or after January 7, 2005.[10]  (Doc. No. 207-25 at 39:19-23.)

Plaintiff does not dispute Defendant Long's testimony that, if he reviewed the progress notes during this timeframe and discovered from those progress notes that an inmate was refusing surgery because he wished to consult with his attorney first, Defendant Long would "wait for [ ] that gentleman to come back" after speaking with his lawyer before proceeding. (Doc. No. 207-26 at 28.)  Plaintiff also doesn't contest Defendant Long's submission that, if an inmate refused to consent to surgery, "[t]hat would be the end[, as] a patient has the right to make their decisions about their body that they want to make."  (Id. at 45:12-14.)

## II.    SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(a) requires the court to render summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)

---

Q.    That's fine, that's what I'm trying to clarify. When you said you had three complaints about your eye, do you know when you made those complaints?

A.    No.

(Doc. No. 207-25 at 43.)

[10] Specifically, Plaintiff testified in response to the question of whether he ever asked to have the surgery after January 2005, "

(emphasis in original).  A factual dispute is material if it might affect the outcome of the suit under the applicable law, and is genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).  Thus, where no material fact is in dispute, the moving party need only establish that it is entitled to judgment as a matter of law.  Anderson, 477 U.S. at 248.  Conversely, where there is a dispute as to an issue of material fact, the moving party must establish that the factual dispute is not a genuine one.  Id.

The party moving for summary judgment bears an initial burden of identifying evidence that it believes demonstrates the absence of a genuine issue of material fact.  Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145-46 (3d Cir. 2004).  Once the moving party has carried this initial burden, "the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986) (internal quotation marks omitted).  If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is warranted.  Celotex, 477 U.S. at 322.  With respect to the sufficiency of the evidence that the non-moving party must provide, a court should grant summary judgment where the non-movant's evidence is merely colorable, conclusory, or speculative.  Anderson, 477 U.S. at 249-50.  There must be more than a scintilla of evidence supporting the non-moving party and more than some metaphysical doubt as to the material facts.  Id. at 252; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

In determining whether there is a genuine issue of material fact, the court must view the facts and all reasonable inferences in favor of the nonmoving party.  Moore v. Tartler, 986 F.2d 682 (3d Cir. 1993); Clement v. Consolidated Rail Corp., 963 F.2d 599, 600 (3d Cir. 1992); White v. Westinghouse Electric Co., 862 F.2d 56, 59 (3d Cir. 1988).  In deciding a motion for summary judgment, the court need not accept allegations that are merely conclusory in nature, whether they are made in the complaint or a sworn statement.  Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888 (1990).  Moreover, the court's function is not to make credibility determinations, weigh evidence, or draw inferences from the facts.  Anderson, 477 U.S. at 249.  Rather, the court must simply "determine whether there is a genuine issue for trial."  Id.

## III.   DISCUSSION

### A.   Eighth Amendment Deliberate Indifference Claim Against Defendant Long

As noted above, Plaintiff advances an Eighth Amendment deliberate indifference claim against Defendant Long arising out of the cancellation of his previously scheduled surgical procedure on January 7, 2005 due to Plaintiff's refusal to sign the surgical consent form. Distilled to his essential challenge, Plaintiff complains that Defendant Long hastily credited Plaintiff's expressed refusal to consent to the surgical procedure scheduled for January 7, 2005 instead of ensuring that the surgery would be performed as scheduled.

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain," which includes "deliberate indifference to serious medical needs of prisoners."  Estelle v. Gamble, 429 U.S. 97, 103-04 (1976)).  To prevail on a claim of deliberate indifference, Plaintiff must establish that Defendant Long exhibited deliberate indifference to his serious medical need.  This standard

15

is two-fold, requiring Plaintiff to make an "objective" showing that the deprivation was

sufficiently serious, and a "subjective" showing that Defendant acted with a "sufficiently

culpable state of mind." Montgomery v. Pinchak, 294 F.3d 492, 499 (3d Cir. 2002) (quoting

Wilson v. Seiter, 501 U.S. 294, 298 (1991)).  Specifically, in this context, Plaintiff must

demonstrate "(i) a serious medical need, and (ii) acts or omissions by prison officials that

indicate deliberate indifference to that need." Natale v. Camden Cnty. Corr. Facility, 318 F.3d

575, 582 (3d Cir. 2003); see also West v. Keve, 571 F.2d 158, 161 (3d Cir. 1978) ("This standard

is two-pronged.  It requires deliberate indifference on the part of prison officials and it requires

the prisoner's medical needs to be serious.").

The United States Court of Appeals for the Third Circuit has defined serious medical

need as follows:

> [T]he concept of a serious medical need . . . has two components, one relating to
> the consequences of a failure to treat and one relating to the obviousness of those
> consequences. The [inmate's] condition must be such that a failure to treat can be
> expected to lead to substantial and unnecessary suffering, injury, or death.
> Moreover, the condition must be 'one that has been diagnosed by a physician as
> requiring treatment or one that is so obvious that a lay person would easily
> recognize the necessity for a doctor's attention.'

Colburn v. Upper Darby Twp., 946 F.2d 1017, 1023 (3d Cir. 1991) (quoting Monmouth Cnty.

Corr. Institutional Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987)).

The Court previously determined that Plaintiff has provided sufficient evidence that a

reasonable jury could find that his medical needs were serious.  (Doc. No. 224 at 11.)  The

unresolved issue remaining before the Court is whether Defendant Long displayed deliberate

indifference to that serious medical condition through his inaction—i.e., permitting the

cancellation of Plaintiff's offsite surgical procedure despite knowing that Plaintiff required medical intervention.  Deliberate indifference is defined as a "subjective standard of liability consistent with recklessness as the term is defined in criminal law."  Natale, 318 F.3d at 582.  Satisfying this subjective element requires proof that the defendant knew of and disregarded an excessive risk to inmate health or safety.  Id. (citation omitted).  Deliberate indifference has been found "in a variety of circumstances, including where the prison official (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment."  Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999) (citations omitted).

Judged against the foregoing principles, and upon the Court's detailed assessment of the arguments raised in the parties' briefing and the extensive record before it, it is clear that summary judgment in favor of Defendant is appropriate as a matter of law, as the evidence contained within the record definitively forecloses the alleged constitutional violation giving rise to this action.  Specifically, this Court finds that no reasonable juror could conclude from the undisputed facts and controverted evidence presented in the light most favorable to the Plaintiff that Defendant Long manifested deliberate indifference to Plaintiff's serious medical needs.

As an initial matter, Plaintiff has failed to establish Defendant Long's personal involvement in the alleged deprivation of Plaintiff's constitutional rights.  Pursuant to 42 U.S.C. § 1983, a plaintiff asserting a deprivation of his civil rights by a state actor must meet a threshold requirement of demonstrating a defendant's personal involvement in the alleged misconduct.  Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988).  "A defendant in a civil rights action

must have personal involvement in the alleged wrongs to be liable, and cannot be held responsible for a constitutional violation which he or she neither participated in nor approved." Baraka v. McGreevey, 481 F.3d 187, 210 (3d Cir. 2007). "Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence. Allegations of participation or actual knowledge and acquiescence, however, must be made with appropriate particularity." Id. Allegations that contemplate the imposition of liability based on respondeat superior are simply insufficient for purposes of establishing a defendant's personal involvement in the purported violation of plaintiff's federal civil rights. Id.

Applied here, Plaintiff has not provided any factual or evidentiary support to establish Defendant Long's personal involvement in the decision to discontinue Plaintiff's scheduled surgery. Rather, Plaintiff attempts to hold Defendant Long personally culpable for the alleged acts of misconduct based solely on his supervisory status, which runs afoul of the well-settled rule barring civil rights liability based upon a theory of respondeat superior. Indeed, it is clear that liability here is predicated on the nursing staff's purported failure to counsel Plaintiff regarding the form in light of his difficulties in understanding the English language or alternatively facilitate Plaintiff's request for an attorney to review the form with him.[11] Relevant

---

[11] To the extent that Plaintiff attempts to advance a supervisory liability claim against Defendant Long premised on a challenge to the requirement that "prisoners sign a form as a condition of receiving medical treatment without taking steps to ensure that prisoners understood the form," such a claim fails. (Doc. No. 105 at ¶ 23.) The Third Circuit has instructed that:

> to hold a supervisor liable because his policies or practices led to an Eighth Amendment violation, the plaintiff must identify a specific policy or practice that the supervisor failed to employ and show that: (1) the existing policy or practice created an unreasonable risk of the Eighth Amendment injury; (2) the supervisor was aware that the unreasonable risk was created; (3) the supervisor was

to the Court's assessment of Defendant Long's involvement in the alleged acts of misconduct, it

is undisputed that Defendant Long did not: (1) direct that the surgical consent forms, furnished

by the offsite ophthalmologist, be provided to Plaintiff for his signature; (2) witness medical

personnel attempt to obtain Plaintiff's informed written consent for the surgical procedure; or (3)

administer the forms himself.  Moreover, Plaintiff concedes that he did not directly or indirectly

communicate with Defendant Long regarding his refusal to give written consent for the

procedure at any point before or after the scheduled procedure was cancelled.  Plaintiff has

additionally has not adduced evidence substantiating that Defendant Long actually reviewed the

nursing note entries detailing the attempts made to obtain Plaintiff's written consent, or was

otherwise made aware of Plaintiff's stated reasons for refusing to give his written consent to the

surgical procedure and the circumstances under which consent was not given.  While the record

reflects that Defendant Long reviewed and co-signed the DC-462 form prepared by Ms. Merlini,

that alone does not give rise to the personal involvement of Defendant Long, as that form does

not contain any reference to Plaintiff's alleged language barrier or request for legal counsel, but

---

indifferent to that risk; and (4) the injury resulted from the policy or practice.

Beers-Capitol v. Whetzel, 256 F.3d 120, 134 (3d Cir. 2001) (citing Sample, 885 F.2d at
1118).

These elements have not been satisfied with respect to Defendant Long.  Specifically, Plaintiff
has failed to meet his evidentiary burden of establishing: (1)  a specific supervisory practice or
procedure that Defendant Long failed to employ; (2) that the existing custom or practice of
requiring prisoners to sign medical forms without ensuring that they understand the forms, in the
absence of that specific practice or procedure, created an unreasonable risk; and (3) that
Defendant Long was aware of an unreasonable risk created by requiring inmates to given their
written consent to various medical procedures without ensuring that they understand the forms
they are signing.

merely states that Plaintiff had refused enucleation of his left eye and understood that "without it pain w[ould] continue."[12]  (Doc. No. 207-24 at 1.)

Even assuming, <u>arguendo</u>, that Plaintiff could overcome that initial hurdle of producing evidence of Defendant Long's personal involvement in the discontinuation of his surgical procedure, Plaintiff has not proffered any evidence from which a reasonable jury could infer that the alleged failures arising out of his refusal to complete the consent form for the January 7, 2005 surgical procedure were in any way the result of deliberate indifference on the part of the Defendant Long.  The record is replete with examples of Defendant Long's attentiveness in affording Plaintiff ongoing clinical evaluation, diagnostic testing, and monitoring during the relevant period.  Defendant Long promptly and efficiently scheduled offsite care from numerous specialists, approved treatment plans recommended by those offsite specialists, and filled

_____

[12] Plaintiff argues that Defendant Long attested to reviewing the December 24, 2004 progress note indicating that Plaintiff had a "knowledge deficit" and signed off on it.  (Doc. No. 232 at 6.) However, when considering Defendant Long's deposition testimony together with the referenced progress note, it becomes clear that Plaintiff misreads the testimony.  That deposition transcript provides, in relevant part:

> Q.      . . . Were you notified of this progress note?
> A.      At that point in time, I don't know.  I don't know if at that point if I would have been notified or not. . . .  I'm assuming I would have made a note if I had.
> Q.      Is there anything in the record that you've seen indicating that you were notified of this?
> A.      Yes, I was notified that day.
> Q.      You were notified of that?
> A.      I signed off on it.  He has a refusal form that he refused to sign on 12/24/04.

(Doc. No. 207-26 at 96:8-24.)  The progress note contains no signature from Defendant Long. Rather, as Defendant Long explains in his deposition, he signed the DC-462 form. Defendant Long did not testify to reviewing the progress note, but rather, to reviewing and co-signing the DC-462 form.

prescription orders before and after the cancellation of the scheduled procedure.  Moreover, the "undisputed evidence shows that Defendant [Long] continued to provide medical treatment to Plaintiff despite his [ ] refusal to sign the release."  Parker v. Burris, No. 1:13CV488, 2015 WL 1474909, at *7 (M.D.N.C. Mar. 31, 2015), report and recommendation adopted, No. 1:13CV488, 2015 WL 2169148 (M.D.N.C. May 8, 2015), aff'd, 623 F. App'x 82 (4th Cir. 2015), cert. denied, 136 S. Ct. 1716 (2016).[13]

While Plaintiff insists that Defendant Long denied Plaintiff necessary surgical intervention on January 7, 2005, the evidence before the Court compels a finding that the cancellation was solely due to Plaintiff's refusal to complete the offsite ophthalmologist's authorization form.  Generally, an inmate's refusal to receive treatment precludes an inmate from establishing that treating medical personnel exhibited deliberate indifference to his medical needs.  Nelson v. Deming, 140 F. Supp. 3d 248, 261 (W.D.N.Y.  2015) ("An inmate's refusal to receive treatment indicates that the inmate's treating doctors and nurses were not deliberately indifferent to the inmate's medical needs.") (citing  Jones v. Smith, 784 F.2d 149, 152 (2d

---

[13] Assuming for purposes of this analysis that Defendant Long had,  in fact, reviewed Ms. Merlini's progress note, which assessed Plaintiff as having a "knowledge deficit" and specified that Plaintiff refused to sign the consent form without his attorney present, and thus, was vaguely aware of the circumstances resulting in Plaintiff's refusal to give informed consent, Plaintiff has failed to show that Defendant Long interfered with the scheduled procedure by failing to act on the information imparted to him.  Indeed, Plaintiff has not produced countervailing evidence to rebut Defendant Long's testimony that he would not have equated the shorthand notation, "knowledge deficit," with a language barrier preventing Plaintiff from understanding the form's content, his testimony that had he known of Plaintiff's frustrated efforts to decipher the consent form, he would have taken "every step [he] c[ould] to make sure [he] do[es] understand it,"  his testimony that he would have simply delayed the surgical procedure pending Plaintiff's consultation with his attorney had he discovered that Plaintiff merely wished to consult with his attorney prior to giving his written consent, and his testimony that he would have revisited surgery if Plaintiff later expressed a willingness to undergo a previously scheduled procedure. (Doc. No. 207-26 at 53:10-18.)

21

Cir.1986) (district court properly dismissed the plaintiff's deliberate indifference claim because given the inmate's "constant declinations to be treated by prison doctors, failure to treat his back was at best a question of malpractice")); Ross v. Kelly, 784 F. Supp. 35, 47 (W.D.N.Y. 1992) (where the plaintiff often disagreed with his physicians and refused treatment on a number of occasions, he failed to state a claim for deliberate indifference)), aff'd, 970 F.2d 896 (2d Cir. 1992).

Plaintiff's deposition testimony undercuts Plaintiff's position that he did not sign the consent form due to his inability to understand its contents.  Rather, the only reasonable inference to be drawn from this deposition testimony is that Plaintiff alone, not Defendant Long, interfered with his medical treatment.  Specifically, he admits that the referred ophthalmologist explained to him the risks and benefits of the surgery at the time of his surgical consult and advised him that, without the surgery, he had a "50 percent chance of losing [his] other eye, and a 50 percent chance of not losing it," and that the nurse informed him shortly thereafter that he "had to sign [the form] so that they would take the eye out.  And [he] told her [he] wasn't going to sign if there wasn't a lawyer there."  (Doc. No. 207-25 at 60-61.)  Indeed, Plaintiff's own testimony suggests that he had an understanding, albeit a limited one, that performance of the scheduled surgery was conditioned on his written informed consent.  Crucially, Plaintiff concedes that he did not request an interpreter, demand to speak with Defendant Long regarding the form, inquire into why his surgery was cancelled, or renew his request for enucleation of his left eye upon discovering that his surgery was cancelled.  All in all, the record reflects that Defendant Long attempted to treat Plaintiff's vision loss and pain in his left eye with appropriate medical treatment.  However, his efforts were hindered by Plaintiff's refusal to consent to

treatment.  Smith v. Black Hawk Cty. Jail, No. C 06-2055-LRR, 2008 WL 538448, at *10 (N.D.

Iowa Feb. 25, 2008) ("[I]t cannot be said that the defendants were deliberately indifferent to

[plaintiff's] serious medical needs. . . . [D]efendants . . . attempted to treat his medical condition

(a rash) with appropriate medical treatment.  However, their efforts were impeded when

[plaintiff] refused to consent to treatment.  This was not deliberate indifference.") (citations

omitted); Logan v. Clarke, 119 F.3d 647, 649-50 (8th Cir. 1997) ("Although [plaintiff] may have

refused this treatment because he had not been apprised of the potential risks, the prison's offer

demonstrates the doctors were not consciously disregarding his need. . . . The doctors' efforts,

which were impeded by [plaintiff's] apparent inability or refusal to follow their instructions,

cannot be said to have been deliberately indifferent.").

　　　　Taken together, the documentary materials Plaintiff in opposition to Defendant Long's

motion for summary judgment do not create a genuine issue of material fact sufficient to

preclude entry of summary judgment on his Eighth Amendment claim, as the evidence

establishes that Defendant Long lacked the requisite personal involvement in the alleged

constitutional violation.  Furthermore, no reasonable juror could find that the subsequent

cancellation of Plaintiff's surgery due to his refusal to complete the offsite ophthalmologist

consent form was an act of deliberate indifference on the part of Defendant Long.[14]

---

[14] Moreover, insofar as Plaintiff implies that Defendant Long should have proceeded with the
surgery and ignored Plaintiff's refusal to give informed consent, such an argument does not give
rise to an actionable claim.  Indeed, it is well settled that "convicted prisoners . . . retain a limited
right to refuse treatment and a related right to be informed of the proposed treatment and viable
alternatives."  While the Third Circuit has contemplated that a "prison may compel a prisoner to
accept treatment when prison officials, in the exercise of professional judgment, deem it
necessary to carry out valid medical or penological objectives," that determination is a matter of
professional judgment.  White v. Napoleon, 897 F.2d 103, 113 (3d Cir. 1990).  In the context of

Accordingly, summary judgment will be entered in favor of Defendant Long on Plaintiff's Eighth Amendment deliberate indifference claim.

B.      P<small>ENDANT</small> S<small>TATE</small> L<small>AW</small> C<small>LAIMS</small>

Defendant Long also urges the Court to enter summary adjudication in his favor on Plaintiff's pendent state law claims of medical malpractice and negligent infliction of emotional distress.

As it relates to Plaintiff's medical malpractice claim against Defendant Long, Defendant Long submits that Plaintiff has failed to provide any "expert testimony that [he] deviated from the standard of care or that [Plaintiff's] claimed damages can be causally linked to [him]."  (Doc. No. 205 at 13.)  In opposition, Plaintiff argues that summary judgment should be denied because sufficient evidence exists in the record that Defendant Long "knowingly refused to provide necessary medical care."  (Doc. No. 232 at 13.)  Plaintiff insists that, should this Court permit Plaintiff's Eighth Amendment deliberate indifference claim to proceed to trial, it should permit Plaintiff's state law claims, to the extent they arise out of the same set of operative facts, to proceed as well.  (Id.)

---

the Eighth Amendment claim, any attempt to second-guess the propriety or adequacy of a particular course of treatment is disavowed by courts, as that determination falls within the ambit of a medical professional's sound judgment.  Inmates of Allegheny Cnty. Jail v. Pierce, 612 F.2d 754, 762 (3d Cir. 1979) (quoting Bowring v. Godwin, 551 F.2d 44, 48 (4th Cir. 1977)); see, e.g., Brown v. Borough of Chambersburg, 903 F.2d 274, 278 (3d Cir. 1990) ("[A]s long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights.").  Here, the record supports that Defendant Long opted to credit Plaintiff's expressed refusal to consent to the scheduled procedure based upon his belief that his patient "has the right to make . . . decisions about [his] body that [he] want[s] to make." (Doc. No. 207-26 at 45:11-15.)  Thus, inasmuch as Plaintiff merely disagrees with the independent medical judgment of Defendant Long by respecting what he believed to be Plaintiff's informed decision not to go through with the surgery, he has failed to present evidence supporting an Eighth Amendment deliberate indifference claim.

The Court agrees with Defendant Long.  In order to establish a prima facie case of malpractice under Pennsylvania law, "a plaintiff must establish (1) a duty owned by the physician to the patient, (2) a breach of duty from the physician to the patient, (3) that the breach of duty was the proximate cause or, or a substantial factor in, bringing about the arm suffered by the patient, and (4) damages suffered by the patient that were a direct result of that harm." Mitzelfelt v. Kamrin, 584 A.2d 888, 891 (Pa. 1990).  "The standard of care in Pennsylvania malpractice cases is measured by the skill generally possessed and employed by practitioners of the profession . . . . Expert testimony is required to establish the relevant standard and whether defendant complied with that standard."  Lentino v. Fringe Emp. Plans, Inc., 611 F.2d 474, 480 (3d Cir.1979) (adopting Pennsylvania's requirement for expert testimony in legal malpractice actions).  However, an exception exists to the requirement of expert witness testimony in medical malpractice actions where the matter is said to be "so simple, and lack of skill or want of care so obvious, as to be within the range of ordinary experience and comprehension of even nonprofessional persons."  Brannan v. Lankenau Hospital,  417 A.2d 196 (1980).  This exception is narrowly applied.  Toogood v. Rogal, 573 Pa. 245, 824 A.2d 1140, 1149 (2003).

Here, the Court finds that Plaintiff has failed to produce any evidence, let alone expert testimony, establishing that the cancellation of Plaintiff's surgery amounted to a deviation from the applicable medical standard of care and that Defendant Long's purported failure to exercise the care and judgment of a reasonable professional was a substantial factor in bringing about the harm suffered by Plaintiff.[15]  See Thomas v. United States, 558 F. Supp. 2d 553, 563 (M.D. Pa.

---

[15] By means of clarification, the Court, in its Memorandum and Order dated May 14, 2015, denied Defendants Long and Weaver's motions for summary judgment only insofar as they

2008) (entering summary judgment in favor of defendants due to plaintiff's failure to produce any expert testimony establishing negligence).  Accordingly, Defendant Long is entitled to summary judgment on this claim.

Consequently, Plaintiff's negligent infliction of emotional distress claim likewise fails.  A plaintiff advancing a negligent infliction of emotional distress claim "must also establish the elements of a negligence claim, i.e., that the defendant owed a duty of care to the plaintiff, the defendant breached that duty, the breach resulted in injury to the plaintiff, and the plaintiff suffered an actual loss or damage."  Wilder v. United States, 230 F. Supp. 2d 648, 654 (E.D. Pa. 2002) (citing Brown v. Phila. College of Osteopathic Medicine, 760 A.2d 863, 868 (Pa. Super. 2000)).  Because this Court has found that Plaintiff has failed to proffer evidence establishing the elements comprising a claim of medical malpractice under Pennsylvania law, it follows that Plaintiff has also failed to meet his evidentiary burden of establishing his negligent infliction of emotional distress claim.  Thus, the Court will grant Defendant Long's motion for summary judgment as to Plaintiff's negligent infliction of emotional distress claim.

## IV.    CONCLUSION

---

sought dismissal of Plaintiff's Eighth Amendment deliberate indifference claim for failure to submit expert testimony.  (Doc. No. 224.)  The Court made no ruling with respect to the need for expert testimony on Plaintiff's medical malpractice claim.  Furthermore, early in this litigation, Plaintiff filed a certificate of merit under Pennsylvania Rule 1042.3(a)(3) certifying that no expert testimony would be needed to advance his medical malpractice claim against Defendant Long.  (Doc. No. 111.)  While a district court may not "reject a filing under Rule 1042.3(a)(3) . . . [as] Pennsylvania law expressly allows a plaintiff to proceed on the basis of a certification that expert testimony will not be required to prove her claim," the Third Circuit has cautioned that a Rule 1042.3(a)(3) filing may have repercussions on summary judgment or at trial.  Liggon-Redding v. Estate of Sugarman, 659 F.3d 258, 265 (3d Cir. 2011).

Based upon the foregoing, the Court will grant Defendant Long's motion for summary judgment (Doc. No. 204), and close the above-captioned case.

An appropriate Order follows.